IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs April 20, 2004

**STATE OF TENNESSEE v. BRIAN KEITH JACKSON**

**Direct Appeal from the Criminal Court for Hamilton County**
**No. 238096    Rebecca Stern, Judge**

_____

**No. E2003-00606-CCA-R3-CD**
**May 26, 2004**
_____

The Defendant, Brian Keith Jackson, was found guilty by a jury of second degree murder.  In this direct appeal, he argues (1) that the trial court erred by refusing to play a pornographic video tape for the jury after it was admitted into evidence, and (2) that the evidence is legally insufficient to sustain his conviction.  Although the trial court did err by not playing the video in front of the jury, the error was harmless.  Furthermore, because the evidence is sufficient to sustain the Defendant's conviction, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

DAVID H. WELLES, J., delivered the opinion of the court, in which JOE G. RILEY and THOMAS T. WOODALL, JJ., joined.

Mike A. Little, Chattanooga, Tennessee, for the appellant, Brian Keith Jackson.

Paul G. Summers, Attorney General and Reporter; John H. Bledsoe, Assistant Attorney General; Bill Cox, District Attorney General; and Mary Sullivan Moore, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

When the victim, Lester Childress, did not show up for work at the Casual Male Big and Tall store on July 26, 2001, his manager and longtime friend James Davis, Jr. became concerned.  Mr. Davis called two of the victim's friends, Ronnie Roberts and Jason Caylor, whom he knew had a key to the victim's house.  The three of them went to the victim's house, and, upon entering the victim's bedroom, discovered his dead body on the floor, dressed only in underwear.

Michael Jones, a paramedic who responded to the scene, and Royellen Lamarre, a crime scene technician, both testified that they found the victim laying face down on the floor of his bedroom.  Both described a large amount of blood on the back of the victim's neck and down his

back. Mr. Jones also explained that he saw several puncture wounds at the top of the victim's back. Ms. Lamarre recovered a white knife handle, but the blade was not located. Margaret Bash, who worked at the Tennessee Bureau of Investigation crime lab, testified that the victim's blood was located on the underwear he was wearing, on a chair in the bedroom, and on the bedroom wall. She also found blood on the knife handle, but she was unable to determine whose blood it was. Several witnesses testified that it was obvious that a struggle had occurred in the bedroom because blood was present, the bed was broken, and the mattress and box springs were off of the bed rails.

Hunter Greene with the T.B.I. crime lab testified that swabs taken from the victim's anus revealed the presence of semen and saliva. Furthermore, there was saliva on the victim's penis. However, Mr. Greene was unable to determine whose semen or saliva was present. No semen was detected in the victim's mouth.

Frank King, the Hamilton County Medical Examiner, testified that he performed the autopsy on the victim's body. The victim died from multiple stab wounds. Dr. King testified that he counted twenty-eight stab wounds on the victim's body. He thought that three of those stab wounds were fatal because they penetrated three inches into the victim's left upper neck, cutting into the carotid artery and jugular vein. Dr. King also located a stab wound to the left chest area of the victim, and this wound caused significant bleeding and caused the victim's left lung to collapse. Dr. King stated that these wounds, if untreated, would cause death in approximately half an hour. Dr. King estimated that the knife came into contact with the victim's body sixty to seventy times. He also surmised that the victim could have survived had he received medical attention. In addition, he found evidence of blunt force trauma. There were bruises on the victim's body, the front tooth was broken at the gum line, there was a hemorrhage in the left eye, and two hemorrhages under the scalp, all caused by blunt force. Dr. King found twelve incisions on the victim's hands, which he said indicated a struggle. He also characterized those wounds as "defensive wounds." Dr. King said that there was no trauma to the victim's neck that would indicate strangulation. The victim had cocaine in his system, and Dr. King also found semen in the victim's anus.

Police investigators began to inquire of the victim's friends regarding with whom the victim had been spending time shortly before his death. The victim was a homosexual, and his friend Mr. Davis testified that, on July 7, 2001, less than three weeks before his death, the victim met the Defendant. The Defendant came in the store where the victim and Mr. Davis worked. Mr. Davis testified that the Defendant and the victim flirted with each other for about an hour. In the days and weeks following, the Defendant and the victim began a personal relationship. Mr. Davis testified that the victim began to have "feelings" for the Defendant, and he was "very happy."

Detective Ralph Freeman testified that he learned that the Defendant was the last person seen with the victim. The Defendant was located in Georgia two days after the victim's body was discovered. The Defendant initially said that he had not seen the victim for a week, and he did not know the victim was dead. However, Det. Freeman said that the Defendant did not seem surprised by the victim's death. When Det. Freeman confronted the Defendant with inconsistencies in his story, he "started crying" and "wanted to go ahead and get it off his chest because it had been

bothering him." Detective Michael Mathis testified that the Defendant admitted to having a sexual relationship with the victim; then he admitted to being involved in the victim's death.

In his statement to the police, the Defendant explained that he met the victim at the clothing store. He said that the victim told him that if he would like to "party," to give him a call, and the victim gave him his telephone number. According to the Defendant's statement, sometime later he met the victim at a homosexual bar called the Tool Box. The two of them drank, smoked marijuana, and exchanged phone numbers. On another occasion, he went with the victim to the Tool Box, where the victim was employed as a female impersonator; then they went to the victim's house. On another occasion, the victim left a message for the Defendant to call him, which he did. The victim then came and picked up the Defendant, who had already been drinking vodka and "smoking." They arrived at the victim's house just before seven o'clock. The Defendant told the police that, when they went inside the victim's house, the victim brought out a television and VCR. The victim began playing a pornographic videotape depicting men having sex. The Defendant asked the victim to stop the tape, and he did. The Defendant told the police that the victim then performed oral sex on him.

The Defendant told the police that, when the oral sex was over, he went to the bathroom to urinate. When he returned from the bathroom, the victim, wearing only underwear, "yank[ed] [the Defendant's] pants down." The Defendant speculated that the victim wanted to "take [his] ass." He told the victim "that ain't gonna happen" and began to leave. However, the victim asked him to stay, and he did. He sat down on the couch and lit a cigarette. After a few minutes, the victim push[ed] [the Defendant] down and [got] on top of [him]." According to the Defendant, this occurred in the living room. The two men struggled, and the Defendant spotted "a butter knife or some kind of knife" on the chair in the victim's bedroom.[1] He described the knife as having a white handle. He grabbed the knife and stabbed the victim "quite a few times trying to get him off." However, the victim said nothing and did not let go of the Defendant. The knife broke, and the Defendant, still being held by the victim, got his belt, and wrapped it around the victim's neck. The victim struggled until he passed out from being strangled. When the Defendant saw that the victim was no longer moving, he took the belt and the victim's keys and left the house in the victim's car. He told police that he did not lock the door behind him. He then drove around for awhile before abandoning the car in a church parking lot.

The Defendant testified at trial. He recounted how he met the victim at the men's clothing store, and stated that they drank and smoked marijuana together about four times. The last time he was with the victim was at the victim's house. The victim brought out a pornographic video, which he played while he and the Defendant smoked marijuana. The victim performed oral sex on the Defendant on the couch in the victim's living room. The Defendant testified that he went to the bathroom, and, when he came out, the victim, who had taken off his clothes and was wearing only underwear, "grab[bed] [him] from behind." The Defendant said, "Please don't do this," and he felt the victim's erect penis on his back, "humping" him. The two of them fought, and the Defendant

---

[1]The Defendant failed to explain in his statement how or at what point the event moved from the victim's living room into his bedroom.

grabbed a knife. The Defendant testified that, although he was stabbing the victim with the knife, the victim did not respond. Eventually the victim let go of the Defendant, but he grabbed him again. At that point, the Defendant took his belt and wrapped it around the victim's neck. When the victim was no longer moving, the Defendant left in the victim's car and drove around for awhile before leaving the car in a church parking lot. The Defendant testified that he was afraid the victim was going to rape him, and that was why he killed him.

To rebut the testimony of the State's witness, Janice Mum, that she knew the victim to be "sweet," "kind," and "gentle," the defense called James Tatum. He testified that when the victim was on cocaine, he was "flirtatious," "forward," and a "horn dog." Mr. Tatum recounted one incident where the victim "forced himself" on him by grabbing him and sticking his tongue in his ear. The State then rebutted the testimony of Mr. Tatum with the testimony of Douglas Claycart. Mr. Claycart dated the victim for eight years in the late 1980s. He testified regarding the victim's aversion to violence.

The first issue raised by the Defendant is whether the trial court erred by refusing to play for the jury the pornographic videotape that the Defendant and the victim watched together. Shortly before the killing, the victim and the Defendant watched approximately two and one-half hours of the video in the victim's living room before the Defendant requested that it be turned off. The video depicted men engaged in homosexual acts, including oral sex and anal sex. Also, a warning appeared at the beginning of the video in which a woman dressed in business attire discussed homosexuality, sexually transmitted diseases, and the dangers of unprotected sex, particularly anal sex.

The Defendant moved that the videotape be introduced as evidence to support his argument that the victim initiated a homosexual assault. More specifically, the Defendant requested that the jury view only the warnings announced at the beginning of the video. Defense counsel stated, "I don't want to play the entire video. What I would like to do is play the very beginning that does not involve any pornographic scenes." The State objected on the grounds that the defense had not established that this was the actual video shown immediately prior to the victim's death. The State argued that if any portion of the video was played, then the entire three and one-half hour sexually explicit video should be played.

The trial court ruled that the videotape could be admitted into evidence, but declined to play the tape for the jury in open court. In so ruling, the judge stated,

If [the jury] want[s] to watch it back in the jury room, I am going to let it -- I am not going to play it right now into evidence. They can watch it if they want. You can ask her the nature of it. You can ask her some things on it, like did she see that opening part. I am not going to play it right now. I mean it is going to be so disgusting. The jury has already said they don't want to see it.

The trial judge did allow defense counsel to question Ms. Lamarre, the crime scene technician who viewed the entire video, regarding the opening portion of the video. During his examination of Ms. Lamarre, defense counsel actually read verbatim the video's opening segment regarding the dangers of unprotected anal sex. The Defendant argues on appeal that the tape was relevant to show why he did not want to engage in anal sex with the victim and that the victim was attempting to lure him into such activity by showing him the video.

The decision to admit or exclude evidence is generally left to the trial court's discretion. See State v. James, 81 S.W.3d 751, 760 (Tenn. 2002). However, the issue before us is not whether the trial court erred by admitting the videotape into evidence. Neither party objected to the videotape being admitted, and we can infer that, because the trial court allowed the tape into evidence, it found the tape to be relevant, presumably to the Defendant's claim of self-defense. At one point the judge stated, "The video has been introduced. If the jury wishes to see it back in the jury room, the jury may. I am not going to let them play it in the courtroom." The issue, then, is whether the judge erred by not requiring the evidence to be presented in open court. We conclude that the court did err. Once the trial court determined that the videotape or portions thereof were relevant and admissible, it should have published that evidence to the jury. It was error for the trial judge to simply allow the jurors to decide for themselves whether they wanted to view evidence deemed by the judge to be admissible and relevant to the defense.[2]

However, in light of all the other evidence in this case, we believe the trial court's error in this regard was harmless. The jury heard from several witnesses that the victim and the Defendant watched over two hours of a graphic homosexual video shortly before the Defendant killed the victim. The jury was also made aware that the video depicted in detail men having anal intercourse and engaging in various other sex acts. Most importantly, defense counsel was permitted to read verbatim what was said during the opening portion of the video regarding the dangers of anal sex. Thus, the portion of the video which the Defendant requested to be played in open court was indeed communicated to the jury verbatim. Therefore, the trial court's error in not showing the video for the jury to view in open court does not "affirmatively appear to have affected the result of the trial on the merits." Tenn. R. Crim. P. 52(a); see also Tenn. R. App. P. 36(b).

The Defendant's second issue is whether the evidence is legally sufficient to support his conviction for second degree murder. Tennessee Rule of Appellate Procedure 13(e) prescribes that "[f]indings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt." A convicted criminal defendant who challenges the sufficiency of the evidence on appeal bears the burden of demonstrating why the evidence is insufficient to support the verdict, because a verdict of guilt destroys the presumption of innocence and imposes a presumption of guilt. See State v. Evans, 108 S.W.3d 231, 237 (Tenn. 2003); State v. Carruthers, 35 S.W.3d 516, 557-58 (Tenn. 2000); State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). This Court must reject a

_____

[2]The record does not reflect whether the jury viewed the video or any portion thereof. The judge instructed the jury that if any of the video was to be viewed, the entire jury must view it together.

convicted criminal defendant's challenge to the sufficiency of the evidence if, after considering the evidence in a light most favorable to the prosecution, we determine that any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 319 (1979); State v. Hall, 8 S.W.3d 593, 599 (Tenn. 1999).

On appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable and legitimate inferences which may be drawn therefrom. See Carruthers, 35 S.W.3d at 558; Hall, 8 S.W.3d at 599. A guilty verdict by the trier of fact accredits the testimony of the State's witnesses and resolves all conflicts in the evidence in favor of the prosecution's theory. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). Questions about the credibility of witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact, and this Court will not re-weigh or re-evaluate the evidence. See Evans, 108 S.W.3d at 236; Bland, 958 S.W.2d at 659. Nor will this Court substitute its own inferences drawn from circumstantial evidence for those drawn by the trier of fact. See Evans, 108 S.W.3d at 236-37; Carruthers, 35 S.W.3d at 557.

Our criminal code defines second degree murder as "[a] knowing killing of another." Tenn. Code Ann. § 39-13-210(a)(1). A person acts knowingly when that person "is aware that the conduct is reasonably certain to cause the result." Id. § 39-11-302(b).

Essentially the Defendant argues that the evidence is not sufficient to support a second degree murder conviction because he acted in self-defense. However, whether he acted in self-defense was a question of fact for the jury to decide, and, as we stated above, this Court does not re-weigh or re-evaluate the evidence. See Evans, 108 S.W.3d at 236; Bland, 958 S.W.2d at 659. The Defendant testified at trial that he acted in self-defense, and the trial judge instructed the jurors on their duty to find the Defendant not guilty if they determined that he acted in self-defense. Nevertheless, the jury discounted or discredited the Defendant's testimony, as it was entitled to do, and found him guilty of second degree murder. Questions of the credibility of witnesses are also left to the jury, not this Court. See Evans, 108 S.W.3d at 236; Bland, 958 S.W.2d at 659. The victim's death was preceded by at least twenty-eight stab wounds and multiple inflictions of blunt force trauma. Given the brutal and violent nature of this killing, we do not hesitate to find that a rational juror could have found beyond a reasonable doubt that the Defendant knowingly killed the victim. This issue is without merit.

The judgment of the trial court is affirmed.

_____
DAVID H. WELLES, JUDGE